UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JENNIFER PALUMBO,<br><br>    Plaintiff,<br><br>    v.<br><br>ARGO MARKETING GROUP, INC.,<br><br>    Defendant. | Civil Action No. |

COMPLAINT
JURY TRIAL REQUESTED
<u>INJUNCTIVE RELIEF REQUESTED</u>

The Plaintiff, Jennifer Palumbo ("Ms. Palumbo"), by and through undersigned counsel, complains against the Defendant, Argo Marketing Group, Inc. ("Argo"), as follows:

JURISDICTION AND PARTIES

1.      This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*

2.      Ms. Palumbo is a United States citizen residing in Limerick, Maine.

3.      Argo is a Maine corporation with headquarters in Lewiston, Maine.

4.      Argo had 200 or more employees for each working day in each of 20 or more calendar weeks in calendar year 2017.

5.      Argo had 200 or more employees for each working day in each of 20 or more calendar weeks in calendar year 2016.

6.      This Court has subject matter jurisdiction over Ms. Palumbo's federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367.

7.      On or about August 15, 2017, Ms. Palumbo filed a timely Charge/Complaint of Discrimination against Argo alleging unlawful disability discrimination and retaliation with the

Maine Human Rights Commission ("MHRC") and Equal Employment Opportunity Commission ("EEOC").

8. On or about May 14, 2018, the MHRC issued a Notice of Right to Sue with respect to Ms. Palumbo's state law claims.

9. On or about May 22, 2018, the EEOC issued a Notice of Right to Sue with respect to Ms. Palumbo's federal law claims.

10. Ms. Palumbo has exhausted her administrative remedies with respect to all claims set forth in this Complaint.

## JURY TRIAL REQUESTED

11. Ms. Palumbo requests a trial by jury for all claims and issues for which a jury is permitted.

## SUMMARY

12. On February 22, 2017, Argo violated Ms. Palumbo's rights under the MHRA and the ADA by denying her a reasonable accommodation and by terminating her employment because of disability discrimination and in retaliation for her request and need for reasonable accommodation.

## FACTUAL ALLEGATIONS

13. Argo is a call center with headquarters in Lewiston, Maine and a branch office in Pittsfield, Maine.

14. Jason Levesque is the CEO.

15. At the time of these events, Janelle Dunn was the Director of Human Resources ("HR").

16. Ms. Palumbo is now 34 years old. She has been an HR professional for 10 years.

17. In the fall of 2016, Ms. Palumbo was working at a job fair as an HR Professional. At the job fair, Ms. Dunn recruited Ms. Palumbo to join Argo as the HR Business Partner ("HRBP").

18. Ms. Palumbo was offered and accepted a salary of $56,500 per year.

19. Ms. Palumbo worked mainly in Lewiston and traveled to Pittsfield for work once or twice a week.

20. During the recruiting process, Ms. Dunn told Ms. Palumbo that the position had a flexible schedule and that she would have the ability to work from home at times.

21. The position of HRBP was new for Argo.

22. During the final interview and offer negotiation, Ms. Palumbo asked Mr. Levesque about the risk of leaving a job she liked for a newly created position.

23. Ms. Palumbo and Mr. Levesque talked about giving each other three or four weeks' notice.

24. Mr. Levesque agreed to this orally. It was never put in writing.

25. HRBPs are responsible for aligning business objectives with employees and management.

26. The position serves as a liaison to management on human resource-related issues.

27. The successful HRBP acts as an employee champion and change agent.

28. The HRBP typically reports to the CEO or to an executive entity outside of HR, and is a member of senior management.

29. At Argo, Ms. Dunn had Ms. Palumbo report to her.

30. Ms. Dunn's stated reason for having Ms. Palumbo report to Ms. Dunn was to give Mr. Levesque time to understand and appreciate what Ms. Palumbo could do for the organization.

31. Ms. Palumbo's job description was signed by Mr. Levesque.

32. Ms. Palumbo's first day of work was November 15, 2016.

33. Ms. Palumbo discussed her health issues with Ms. Dunn soon after she started work.

34. During the first week in January 2017, as Ms. Palumbo's medical condition worsened, Ms. Dunn told Ms. Palumbo that it would be best to go through the accommodation process.

35. Ms. Dunn gave Ms. Palumbo paperwork to formally request an accommodation.

36. On February 8, 2017, an OB/GYN reiterated Ms. Palumbo's previous diagnosis of severe endometriosis.

37. Ms. Palumbo was referred to a specialist OB/GYN for more testing.

38. Following her appointment with the OB/GYN, Ms. Palumbo texted Ms. Dunn, "The surgery is going to be a lot worst (sic) than I thought – they had me do a lot of tests…So far some good and negative results. My brain is on overdrive."

39. Ms. Dunn's response was sympathetic.

40. On Friday, February 10, 2017, Ms. Palumbo asked by text to take Tuesday, February 14, 2017 off for her own doctor's appointment and to take her mother for a medical procedure.

41. To make up the time, Ms. Palumbo added Saturday February 18, 2017 to her schedule.

42. Ms. Dunn responded to Ms. Palumbo's request by texting, "Yes, of course."

43. On Wednesday, February 15, 2017, following an appointment with her PCP, Ms. Palumbo submitted reasonable accommodation paperwork signed by her nurse practitioner requesting a flexible schedule or the ability to work from home due to her disabilities.

44. In addition to severe endometriosis, Ms. Palumbo also had low back pain/sciatica, depression and anxiety, and migraine headaches.

45. Ms. Dunn approved Ms. Palumbo's accommodation the day it was submitted.

46. Even though Ms. Palumbo's accommodation request was readily granted at the time, Argo claimed in its October 20, 2017 Submission to the MHRC ("Argo's MHRC Submission") that her request was "questionable" and "could have proved a hardship in light of the essential functions of her position."

47. In Argo's MHRC Submission it claimed that: "As a human resources professional, Ms. Palumbo's presence in the office and ability to interact personally with employees and potential employees was critical to her ability to perform the job requirements."

48. The facts undermine Argo's position.

49. Every human resources professional employed by Argo - including Ms. Dunn – regularly worked from home one or more days per week.

50. Argo's MHRC Submission also claims that Ms. Palumbo's limitations could have been addressed by providing her with a stand-up work station and frequent breaks at work.

51. Argo has no medical evidence to support this claim.

52. Argo's MHRC Submission admits that no one suggested any alternative accommodation to Ms. Palumbo during the interactive process.

53. The HR Department consisted of Ms. Dunn (Director), Ms. Palumbo (HRBP), Danielle Skillin (HR Generalist) and Jessica Cote (HR Assistant).

54. Ms. Skillin was involved with payroll, performance management, and responding to employee requests. Ms. Cote assisted the HR Department.

55. In early February 2017, Ms. Dunn and Ms. Palumbo recognized a need for an increased HR presence in the Pittsfield office.

56. Ms. Palumbo told Ms. Dunn that she was interested in taking on a position in the Pittsfield office.

57. Ms. Palumbo had several conversations with Ms. Dunn about moving to the Pittsfield office.

58. Ms. Skillin and Ms. Cote were present during some of these discussions.

59. Ms. Dunn told Ms. Palumbo that she needed Ms. Palumbo in Lewiston.

60. On Friday, February 17, 2017, while Ms. Palumbo was in Pittsfield, the IT person told her that a new HR person was joining the team.

61. Ms. Palumbo was surprised to learn this from someone other than Ms. Dunn after her conversations with Ms. Dunn about transferring to Pittsfield.

62. Ms. Palumbo contacted Ms. Dunn who confirmed that she was posting a new HR Generalist position to be based in Pittsfield.

63. Ms. Palumbo said, "Oh, that's great, so we're adding a member to our team?"

64. Ms. Dunn said, "Yes."

65. On Tuesday, February 21, 2017, Ms. Palumbo had to call out of work due to illness.

66. That was her first call-out since starting work at Argo.

67. On Wednesday, February 22, 2017, Ms. Palumbo was working at a hiring event in South Paris. Ms. Palumbo was at the event training other HR staff and managers on how to handle off-site recruiting.

68. Ms. Palumbo sent a text message to Ms. Dunn at 1:51 PM, immediately following the hiring event, letting Ms. Dunn know that Ms. Palumbo had new information to provide about her surgery.

69. Ms. Dunn texted back that she needed to speak with Ms. Palumbo but could not do so at that moment.

70. At 2:45 PM on February 22, Ms. Palumbo received a text that Ms. Dunn was available to speak.

71. Ms. Palumbo called Ms. Dunn immediately and was informed by Ms. Dunn that her position was eliminated.

72. Ms. Palumbo asked why and was told that the CEO no longer wanted an HRBP in his business.

73. Ms. Palumbo was past the three month anniversary of her first date of employment when she was fired.

74. Ms. Palumbo asked Ms. Dunn about the effective date of her termination because when she was hired, Mr. Levesque had agreed that three or four weeks was the length of notice that each of them would give if they wanted to end the employment relationship.

75. Mr. Levesque had called the three to four week notice a "professional notice."

76. Ms. Dunn told Ms. Palumbo that she would check with Mr. Levesque and that she would also see if Ms. Palumbo's medical coverage could extend through the end of March.

77. Ms. Dunn said that she would have answers for Ms. Palumbo by the end of the week.

78. Ms. Palumbo did not receive any communication from Argo about her employment status until after March 1, 2017 when she received a COBRA package in the mail.

79. Ms. Palumbo was unable to secure health coverage for March 2017 as she had missed the deadline, March 1, 2017, to apply for insurance under the Affordable Care Act due to the delayed COBRA notification from Argo.

80. This caused a delay in Ms. Palumbo's doctor's appointments, testing, and surgery.

81. Ms. Palumbo's unemployment coverage was also delayed by a week.

82. Ms. Palumbo received an email from Ms. Dunn on March 4, 2017.

83. Ms. Dunn informed Ms. Palumbo that she had been directed not to contact her earlier and apologized for the delay.

84. Ms. Dunn told Ms. Palumbo that her termination date was February 22, 2017 and there was no agreement that Argo would give her three or four weeks' notice of termination.

85. After Ms. Palumbo filed a Complaint/Charge of Discrimination with the MHRC and EEOC, Argo alleged for the first time that it had terminated Ms. Palumbo because of alleged poor performance and misconduct.

86. Argo's shifting and contradicting explanations for its termination of Ms. Palumbo evidences pretext.

87. The fact that the alleged performance issues were never communicated to Ms. Palumbo also evidences pretext.

88. In Argo's MHRC Submission it claims that Ms. Palumbo was found to have been deceitful in interactions with other employees.

89. This allegation is untrue, unsupported by any specific allegations, and is evidence of pretext.

90. In Argo's MHRC Submission it claims that Ms. Palumbo failed to follow internal company procedures in the performance of her job responsibilities.

91. This allegation is untrue, unsupported by any specific allegations, and is evidence of pretext.

92. In Argo's MHRC Submission it claims that Ms. Palumbo was insubordinate on her first day of employment.

93. This allegation is untrue, unsupported by any specific allegations, and is evidence of pretext.

94. In Argo's MHRC Submission it claims Ms. Palumbo refused to sign Argo's standard Acknowledgement Statement of Employment at Will form.

95. This allegation is untrue. Ms. Palumbo did not "refuse to sign the form." She told Ms. Dunn about her oral agreement with Mr. Leveque to give each other 3 or 4 weeks' notice if the job was eliminated or Ms. Palumbo resigned.

96. Ms. Dunn told Ms. Palumbo that she would speak to Mr. Levesque about it.

97. Mr. Levesque did not put the agreement in writing and no one got back to Ms. Palumbo about signing the standard Employment at Will form.

98. That was the last time the topic was discussed during Ms. Palumbo's employment.

99. In Argo's MHRC Submission it claims that Ms. Palumbo refused to complete Argo's standard direct deposit form, insisting that she need not complete it because "human resource departments had not done direct deposits that way in 20 years."

100. This is untrue. Ms. Palumbo completed the form but did not attach a voided check. She offered to get – and did get - a letter from her bank to verify her account for direct deposit but her completed form alone was sufficient to allow Argo to set up direct deposit with her bank. Ms. Palumbo did not say "human resource departments had not done direct deposits that way in 20 years." Ms. Palumbo was in middle school 20 years ago. Ms. Palumbo did say that in the past five years she has worked in human resources, voided checks were not required.

101. In Argo's MHRC Submission it claims that Ms. Palumbo insisted that Ms. Levesque had promised her the position for at least 6 months.

102. This allegation is untrue and is evidence of pretext.

103. Ms. Palumbo has disabilities as defined by the MHRA and ADA.

104. She had endometriosis that was so severe that she required surgery to remove her ovaries, fallopian tubes, uterus and cervix (i.e., a total hysterectomy).

105. When viewed in the absence of mitigating measures, Ms. Palumbo's endometriosis substantially limited major life activities and significantly impaired her health.

106. Ms. Palumbo's disability and the treatment of the disability substantially limited the functioning of a major bodily system, Ms. Palumbo's reproductive system.

107. Ms. Palumbo has other disabilities as well including sciatica, depression, anxiety and migraines.

108. Argo knew of Ms. Palumbo's disabilities when she was fired.

109. Ms. Palumbo requested and needed reasonable accommodations from Argo.

110. On February 22, 2017, one week after Argo received Ms. Palumbo's request for reasonable accommodation, Argo terminated Ms. Palumbo's employment.

111. Argo's first stated reasons for firing Ms. Palumbo was job elimination. In a later statement, Argo stated that Ms. Palumbo was fired due to poor performance and misconduct.

112. As discussed above, Argo's stated reasons are false and a pretext for unlawful discrimination and retaliation.

113. Timing supports a finding that Ms. Palumbo was fired due to disability discrimination and retaliation for requesting and needing reasonable accommodation.

114. Argo learned of Ms. Palumbo's diagnoses, her request and current need for accommodation, and her future need for accommodation (surgery) on February 8-15, 2017. On February 22, 2017, Ms. Palumbo was fired.

115. The fact that Argo's stated reasons have changed and evolved over time supports a finding of discrimination and retaliation.

116. The fact that Argo did not follow its own progressive discipline policy supports a finding of discrimination and retaliation.

117. The conduct of Ms. Dunn and Mr. Levesque evidences unlawful animus.

118. The fact that Argo had an ongoing need for an HR professional and was in the process of recruiting and hiring another HR professional when Ms. Palumbo was terminated, supports a finding of discrimination and retaliation.

119. The fact that Ms. Palumbo asked to be hired or reassigned to the new HR Generalist position supports a finding of discrimination and retaliation with respect to hire and reassignment.

120. The fact that Argo has made false allegations about Ms. Palumbo's job performance is proof that Argo is hiding the real reason for terminating her employment, which evidences discrimination and retaliation.

121. Argo knowingly and willfully violated Ms. Palumbo's rights under the ADA and the MHRA.

122. Argo unlawfully discriminated and retaliated against Ms. Palumbo with malice or reckless indifference to her rights.

123. As a result of Argo's unlawful discrimination and retaliation against Ms. Palumbo, she has suffered lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, humiliation, and other pecuniary and non-pecuniary losses.

124. Ms. Palumbo has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and she will continue to suffer irreparable injury from her treatment by Argo unless and until Argo is enjoined by this court.

## COUNT I: MHRA
## UNLAWFUL DISCRIMINATION

125. Paragraphs 1-125 are incorporated by reference.

126. Defendant's conduct constitutes unlawful disability discrimination against Plaintiff in violation of the MHRA.

## COUNT II: MHRA
## FAILURE TO ACCOMMODATE

127. Paragraphs 1-127 are incorporated by reference

128. Defendant violated the MHRA by failing to provide Plaintiff with reasonable accommodations for her disability.

## COUNT III: MHRA
## UNLAWFUL RETALIATION

129. Paragraphs 1-128 are incorporated by reference.

130. Defendant violated the MHRA by retaliating against Plaintiff because she requested and needed a reasonable accommodation for her disability.

## COUNT IV: ADA
## UNLAWFUL DISCRIMINATION

131. Paragraphs 1-130 are incorporated by reference.

132. Defendant's conduct constitutes unlawful discrimination against Plaintiff in violation of the ADA.

## COUNT V: ADA
## FAILURE TO ACCOMMODATE

133. Paragraphs 1-132 are incorporated by reference.

134. Defendant violated the ADA by failing to provide Plaintiff with reasonable accommodation for her disabilities.

## COUNT VI: ADA
## UNLAWFUL RETALIATION

135. Paragraphs 1-134 are incorporated by reference

136. Defendant violated the ADA by retaliating against Plaintiff because she requested and needed reasonable accommodations for her disability.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendant to be in violation of her rights;

B. Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

    C.    Order Defendant to employ Plaintiff in her former position and/or award front pay for future lost earnings to Plaintiff;

    D.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

    E.    Award equitable-relief for back pay, benefits and prejudgment interest;

    F.    Award compensatory damages in an amount to be determined at trial;

    G.    Award punitive damages in an amount to be determined at trial;

    H.    Award nominal damages;

    I.    Award attorney's fees, including legal expenses, and costs;

    J.    Award prejudgment interest;

    K.    Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability;

    L.    Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

    M.    Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

    N.    Require that Defendant train all management level employees on the protections afforded by the ADA and the MHRA;

    O.    Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated her because of disability and retaliation; and

    P.    Grant to Plaintiff such other and further relief as may be just and proper.

Dated: June 18, 2018                  /s/ Chad T. Hansen
                                      Attorney for the Plaintiff

                                      EMPLOYEE RIGHTS GROUP
                                      92 Exchange Street 2nd floor
                                      Portland, Maine 04101
                                      Tel. (207) 874-0905
                                      Fax (207) 874-0343
                                      chansen@maineemployeerights.com